# EXHIBIT A-2

**CAUSE NO.** 2024-05-35537-CV

| | | |
|---|---|---|
| PATRICIA ALBARADO; ERICA BARRERA, Individually and ANF of D.R., Minor; MICHAEL BROWN, Individually and ANF Of V.B.; JENNIFER DAVIS, Individually and ANF of Z.D., Minor; ANGELI ROSE GOMEZ, Individually and ANF G.B. & A.G., Minors; LUZ HERNANDEZ, Individually and ANF of N.J., Minor; CARLA ROSE KING; TIFFANY LUNA, Individually and ANF of A.P., Minor; TAMICA MARTINEZ, Individually and ANF of R.D., Minor; TIFFANY MASSEY; YOLANDA MORALES, Individually and as ANF of Z.G., Minor; NICOLE FAYE OGBURN; MARY ANN REYES, Individually and ANF of A.S. & A.S., Minors; BIANCA RIVERA, Individually, and ANF of G.R., Minor; JENNIEKA RODRIGUEZ; CHRISTIAN and BRENDA SONORA, Individually and ANF V.S.; DAVID TREVINO, Individually and as ANF of A.T., I.T. & D.T., Minors; KRYSTAL UPTON, Individually and ANF of J.T. and B.T., Minors; ESMERALDA VELASQUEZ, Individually and ANF of C.V., Minor; SOFIA ZAPATA, Individually and ANF of M.S., Minor | § § § § § § § § § § § § § § § § § § § § § § § § § § § § | IN THE 38TH DISTRICT COURT |
| *Plaintiffs,* | § § | |
| VS. | § § | OF |
| DANIEL DEFENSE, LLC, a limited Liability Company; DANIEL DEFENSE, INC. a Georgia Corporation; OASIS OUTBACK, LLC, a Texas limited Liability Company; FIREQUEST INTERNATIONAL, INC., an Arkansas Corporation, and FLASH CO., INC., a Colorado Company. | § § § § § § § § | |
| *Defendants.* | § | UVALDE COUNTY, TEXAS |

---

## PLAINTIFFS' ORIGINAL PETITION AND REQUESTS FOR DISCLOSURES

---

FILED
5/21/2024 10:38 AM
Christina Ovalle, District Clerk
Uvalde County, TX
By Alexis Vera

Copy from re:SearchTX

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, PATRICIA ALBARADO, et. al., hereinafter referred to by name or as Plaintiffs, and files their Original Complaint complaining of DANIEL DEFENSE, LLC, a limited liability company; DANIEL DEFENSE, INC., a Georgia corporation; OASIS OUTBACK, LLC, a Texas limited liability company; FIREQUEST INTERNATIONAL, INC., an Arkansas corporation; and FLASH CO., INC., a Colorado corporation.

## I. DISCOVERY CONTROL PLAN

1.1     Plaintiff intends that discovery be conducted under LEVEL 3 of Rule 190 of the Texas Rules of Civil Procedure.

## II. PARTIES

2.1     Plaintiff **Patricia Albarado** is an Individual who resides in Uvalde, Texas.

2.2     Plaintiff **Erica Barrera,** Individually and ANF of D.R., Minor, both of whom reside in Uvalde, Texas.

2.3     Plaintiff **Michael Brown,** Individually and ANF of V.B., Minor, both of whom reside in Uvalde, Texas.

2.4     Plaintiff **Jennifer Davis**, Individually and ANF of Z.D., Minor, both of whom reside in Uvalde, Texas.

2.5     Plaintiff **Angeli-Rose Gomez**, Individually and ANF of G. B & A.G., Minors, all of whom reside in Uvalde, Texas.

2.6     Plaintiff **Luz Hernandez**, Individually and ANF of N.J., Minor, both of whom reside in Uvalde, Texas.

2.7     Plaintiff **Carla Rose King** is an Individual who resides in Uvalde, Texas.

2

2.8     Plaintiff **Tiffany Luna,** Individually and ANF of A.P., Minor, both of whom reside in Uvalde, Texas.

2.9     Plaintiff **Tamica Martinez,** Individually and ANF of R.D., Minor, both of whom reside in Uvalde, Texas.

2.10    Plaintiff **Tiffany Massey** is an Individual who resides in Uvalde, Texas.

2.11    Plaintiff **Yolanda Morales** Individually and ANF of Z.G., Minor, both of whom reside in Uvalde, Texas.

2.12    Plaintiff **Nicole Faye Ogburn** is an Individual who resides in Uvalde, Texas.

2.13    Plaintiff **Maryanne Reyes,** Individually and ANF of A.S and A.S, Minors, all of whom reside in Uvalde, Texas.

2.14    Plaintiff **Bianca Rivera**, Individually and ANF of G.R., Minor, both of whom reside in Uvalde, Texas.

2.15    Plaintiff **Jennieka Rodriguez** is an Individual who resides in Uvalde, Texas.

2.16    Plaintiffs **Christian and Brenda Sonora,** Individually and ANF V.S.; Minor, all of whom reside in Uvalde, Texas.

2.17    Plaintiff **David Trevino**, Individually and ANF of A.T., I.T. & D.T., Minors, all of whom reside in Uvalde, Texas.

2.18    Plaintiff **Krystal Upton,** Individually and ANF of J.T. and B.T., Minors, all of whom reside in Uvalde, Texas.

2.19    Plaintiff **Esmeralda Velasquez**, Individually and ANF of C.V., Minor, both of whom reside in Uvalde, Texas.

2.20    Plaintiff **Sofia Zapata**, Individually and ANF of M.S., Minor, both of whom reside in Uvalde, Texas.

Copy from re:SearchTX

2.21   Defendant **Daniel Defense, LLC** is a limited liability company with its principal office in Black Creek, Georgia. At all relevant times, Daniel Defense LLC was engaged in the business of researching, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising guns, including AR-15 style semi-automatic rifles, for use by untrained civilians and young adults. Daniel Defense, LLC and Daniel Defense, INC. may be served with process by serving its registered agent, Marvin C. Daniel, at 101 Warfighter Way, Black Creek, Georgia 31308 and its CEO Rod Reasen, at 101 Warfighter Way, Black Creek, Georgia 31308.

2.22   Defendant **Daniel Defense, INC.** is a Georgia corporation. At all relevant times, Daniel Defense, INC. was engaged in the business of researching, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising guns, including AR-15 style semi-automatic rifles, for use by untrained civilians and young adults. Daniel Defense, LLC and Daniel Defense, INC. may be served with process by serving its registered agent, Marvin C. Daniel, at 101 Warfighter Way, Black Creek, Georgia 31308 and its CEO Rod Reasen, at 101 Warfighter Way, Black Creek, Georgia 31308.

2.23   Defendant **Oasis Outback, LLC ("Oasis")** is a Texas limited liability company with its principal office in Uvalde, Texas. Oasis Outback is a firearms dealer in the business of selling guns, including AR-15 style semi-automatic rifles, to untrained civilians and young adults in Uvalde, Texas. Oasis Outback served as the local gun dealer for Daniel Defense to complete the sale of guns and ammunition to the Uvalde school shooter. Oasis Outback may be served with process by serving its registered agent, William Randy Klein, at 236 E. Nopal St. Uvalde, Texas 78801.

4

Copy from re:SearchTX

2.24    Defendant **Firequest International, Inc. ("Firequest")** is an Arkansas corporation with its principal place of business in El Dorado, Arkansas. Firequest is an online retailer and supplier of shooting equipment, firearm parts, and firearm accessories. Firequest designed, manufactured, marketed, and sold an accessory trigger system, Hell-Fire Gen 2, that is used to convert a semiautomatic rifle into the equivalent of a machine gun. Firequest is in the business of selling accessory trigger systems like the Hell-Fire Gen 2 trigger system, to untrained civilians, young adults, and minors in Uvalde, Texas. The Hell-Fire Gen 2 trigger system is nearly identical to illegal bump stocks and allows a rifle to fire at a rate like a fully automatic weapon. Firequest designed, manufactured, marketed, and sold the Hell-Fire Gen 2 trigger system to the Uvalde school shooter. Firequest may be served with process by serving its registered agent, Lisa McCuistion, at 505 East 5th Street, El Dorado, Arkansas, 71730.

2.25    Defendant **Flash Co., Inc. ("Flash Co")** is a Colorado corporation with its principal place of business in Montrose, Colorado. Upon information and belief, it is believed that Flash Co, possibly in the alternative of Defendant Firequest International, Inc., designed, manufactured, marketed, and sold an accessory trigger system, Hell-Fire Gen 2, that is used to convert a semiautomatic rifle into the equivalent of a machine gun to the Uvalde Shooter. Flash Co may be served with process by serving its registered agent, Vincent Troncoso, at 236 South Third Street STE 206, Montrose, Colorado 81401.

### III.  JURISDICTION & VENUE

3.1    Venue is proper in Uvalde County, Texas, pursuant to §15.001 of the Texas Civil Practice and Remedies Code as all or a substantial portion of the events made the basis of the lawsuit occurred In Uvalde County, Texas.

Copy from re:SearchTX

3.2     This Court has jurisdiction over the parties named herein because Defendants are residents and citizens of the State of Texas, and/or routinely and regularly conduct business in this state.

3.3     This is a cause of action for money damages within the court's jurisdiction.

3.4     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs seek monetary relief OVER ONE MILLION DOLLARS ($1,000,000.00), which is in excess of the jurisdictional limits of this court, and a demand for judgment for all the other relief to which Plaintiffs deem themselves justly entitled at the time of filing this suit, which, with the passage of time may change and is within the Court's jurisdictional limits. Because Rule 47 of the Texas Rules of Civil Procedure requires Plaintiffs to affirmatively plead the amount of damages sought. Plaintiffs plead that they seek an amount in excess of ONE MILLION DOLLARS ($1,000,000.00) in an amount to be determined by the jury.

3.5     Originally, this case was filed in Federal Court under federal question jurisdiction.  All Defendants and Plaintiffs filed an agreed motion to dismiss.  The Federal Court held no federal question jurisdiction existed. The diversity exists because Oasis outback is a Texas Limited Liability Corporation with its principal place of business in Uvalde, Texas.

## IV. FACTS

4.1     The facts contained in this Petition were compiled without access to police reports, video statements, or autopsy reports as no state agency nor federal agency responded to open records request nor Freedom of Information requests including the ATF, the Uvalde Independent School District, the District Attorney of Uvalde, the Texas Department of Public Safety, the City of Uvalde, The Uvalde Police Department; in an apparent concerted effort to deny the children and families of Uvalde Texas Due Process of Law; and an attempt to prevent United States Citizens information about what occurred which in turn would help prevent such mass shootings in the future.

6

Copy from re:SearchTX

4.2     On the morning of May 24, 2022, at Robb Elementary School in Uvalde, Texas, nineteen (19) children and two teachers were killed, and countless others were injured and traumatized while school officials and hundreds of law enforcement personnel stood by failing to act. Salvador Ramos, hereafter referred as the "shooter", was an 18-year-old Uvalde man with a history of mental disturbance, instability, and domestic issues who it is contended illegally purchased semi-automatic weapons, ammunition, high-capacity magazines, and a Hellfire trigger system to use in the massacre. Due to the conduct of the school and police, and the deliberate choices of the gun makers and sellers to directly market their lethal weapons to young untrained civilians, the shooter bought and assembled a military grade assault weapon with 30-round magazines days before his 18th birthday (although it is contended Ramos took possession of the weapon after he turned 18), and entered the Uvalde Elementary School unabated, wearing tactical gear through an unlocked and/or open door. The shooter was left with free range to shoot, terrorize, and kill children and teachers for over an hour.

4.3     The Plaintiffs in this cause of action, are the small children who were attending their last day of school before summer break, their parents, and schoolteachers, all of whom were present at Robb Elementary during the tragic events that occurred on May 24, 2021, and incurred damages as a result of the Defendants named herein.

### *DEFENDANT DANIEL DEFESE -THE GUN MAKER*

4.4     Daniel Defense is a Georgia-based gun manufacturer who proudly markets itself as a military weapons dealer. Daniel Defense researches, develops, designs, manufactures, markets, and sells semi-automatic weapons, including AR-15 style rifles, for use and possession by civilians and young adults which have the ability to be altered into military style weapons with little to no effort or expertise.

7

Copy from re:SearchTX

4.5    The mass shooting at Robb Elementary was enabled by the illegal, reckless, and negligent actions of Defendant Daniel Defense, which profited from the deceptive marketing of its AR-15 rifles, including the DDM4 V7 rifle that Shooter Ramos purchased. The weapon is marketed in a manner that especially appealed to young men like Ramos with anti-social tendencies and violent impulses and whose acquisition of weapons designed for use in war transforms those tendencies into horrific acts of violence. These facts were illustrated in the September 12, 2022, Unites States Senate letter to the Federal Trade Commission (FTC) urging the Commission to undertake investigation and regulation of the unfair and deceptive advertising practices used by the firearm industry (alluding to Daniel Defense). This letter was signed by twelve United States Senators: Richard Blumenthal, Edward Markey, Christopher Murphy, Richard Durbin, Sheldon Whitehouse, Cory Booker, Dianne Feinstein, Amy Obuchar, Kirsten Gillibrand, Alex Padilla, Elizabeth Warren, and Jack Reed. Daniel Defense's marketing is deceptive and intended to attract those with violent or anti-social tendencies. Daniel Defense does not require any type of identification or in any way try and determine if their online sales are legal. Upon information and belief, the sale to the shooter Ramos, transaction between (Daniel Defense and shooter Ramos) occurred while Ramos was not yet 18 and was therefore illegal.

4.6    Daniel Defense profited from the sale of $528 million AR-15 style rifle sales from 2012 to 2021.[1] Daniel Defense makes millions off the sale of their assault weapons but does not track death, dangers, or crimes resulting from use of their guns, nor does Daniel Defense educate

---

[1] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 6 (July 27, 2022).

Copy from re:SearchTX

consumers of the dangers of use of their weapons by young adults. They do not offer or even suggest that gun safety classes should be taken by those not trained in the use of their products.

### ***DANIEL DEFENSE AGRESSIVELY MARKETS TO UNTRAINED CIVILIANS AND YOUNG ADULTS***

4.7     Although ninety percent of its sales are to civilians, Daniel Defense aggressively markets itself as a military weapons dealer, and in doing so, misleads consumers into believing they are buying military sponsored weapons. The advertising is false and misleading.  It glamorizes the use of Daniel Defense products.

4.8     Daniel Defense markets its rifles to civilian consumers in a manner that appeals to adolescent young men attracted to violent combat and military fantasies and implies that civilians can use their weapons for offensive combat-like missions, thereby increasing the risk that one of these adolescent young men will use the rifle to perpetrate an act of mass violence. The Uvalde shooter was the perfect customer for Daniel Defense: a troubled, violent loner who spent much of his free time on the internet and social media and who fantasized about reenacting video game combat in real life. Daniel Defense knew the risks of its marketing strategy, and like Ramos, who was drawn to notoriety and violence, Daniel Defense by its actions put innocent young school children at risk for profit. The shooting at Robb Elementary was an all-too-foreseeable outcome of Daniel Defense's decision to market its products in a manner that encouraged their illegal misuse. In its print advertising, the civilian consumer is encouraged to "use what they use:" An apparent reference to the military.

9

Copy from re:SearchTX



*Print advertisement available on Facebook (May 30, 2012)*

4.9     Daniel Defense's marketing includes militaristic and combat imagery as well as content specifically aimed at young consumers, referencing video games and the irreverent tone of internet meme culture. This has enabled Daniel Defense to appeal to young male civilian consumers, which can in turn translate to market growth by priming young buyers to purchase AR 15-style rifles as soon as they are legally able.  Daniel Defense hopes they will be "hooked" on the fantasy they sell and become life-long customers.  The strategy has been extremely successful to date.  Daniel Defense, in responding to these allegations invokes the protections of the 2nd

10

Copy from re:SearchTX

Amendment provided for law abiding Americans, who are not part of the fantasy world, targets of Daniel Defense misguided patriotism, and appeal to under-age consumers who are part of the video game generation.



*Image from Daniel Defense 2022 print catalog*

4.10    Daniel Defense regularly promotes its weapons and accessories through appeals to civilian consumers attracted to the thrill, excitement, and violence of combat, without the commitment training and restraint the military imposes. While many companies employ marketing that extols the virtues of military service, Daniel Defense's marketing promotes the company's AR-15-style rifles in a context that implies they may be used by civilians for offensive, combat-like missions. Daniel Defense's marketing images depict men in combat gear on active battlefields telling the purchaser that is what buying this weapon will bring. The purchaser's fantasy, which until then was only internet game driven, may be only in online games, can come to life with Daniel Defense's guns, which Daniel Defense promises have been "tested, proven, and chosen"

11

Copy from re:SearchTX

by the U.S. Military, a totally a false, misleading narrative.  Daniel Defense's guns are accessible to civilian consumers unlicensed, untrained, and as young as 18 years old, and Daniel Defense targets this consumer directly. Daniel Defense intentionally misleads consumers in a fantasy scheme engineered for maximum profit at the expense of American lives.  Daniel Defense marketed their weapons on the video games that Ramos and those like him play, including, "Call to Duty Modern Warfare", and "Grand Theft Auto".

4.11   Daniel Defense is known in the industry for its brazen and provocative marketing as its advertisements feature fast-moving, high-quality videos drowning in electronic music, featuring gun-toting young adults and allusions to popular video games and movies. Daily social media posts are littered with emojis promoting "Saturdays are for the boys," normalizing "kitchen Daniels," and promoting "not your grandpa's bolt gun." Daniel Defense promises young adults power and glamour when using its guns which it couples with the force and prestige of military grade lethality. Again, the company is suggesting that *civilian* consumers should imagine themselves in close combat with the company's AR-15-style rifles. The advertising goes beyond imagery but dearly falls under the category of "false and misleading" as the 12 United States Senators have clearly explained to the Federal Trade Commission.

12



*Facebook (Mar. 13, 2021)*

4.12    Daniel Defense specifically targets young children not of age to purchase its guns. Much of its heavy social media marketing is on Instagram and Twitter, which are popular with youth. Daniel Defense does not limit or age-restrict access to any of its marketing and freely allows all ages to take in its violence-based content. See Daniel Defense's advertisement below discussing training a child with a photo of a child and Daniel Defense's product.

4.13    Just days before the Uvalde massacre, Daniel Defense tweeted a picture of a toddler holding a rifle captioned with a biblical quote from the Book of Proverbs: "Train up a child in the way he should go, and when he is old, he will not depart from it." Certainly, by false, deceptive

13

Copy from re:SearchTX

advertising which clearly denies Daniel Defense any immunity under the laws and statutes of the
United States.



*Twitter (May 15, 2022)*

4.14    Daniel Defense also markets its rifles' placement in violent, first-person-shooter
video games. It amplifies this product placement through online and social media channels. The
Daniel Defense DDM4 V7S rifle—a short-barreled version of the shooter's DDM4 V7—is
featured in *Call of Duty: Modern Warfare*, and the company's social media account references and
tags *Call of Duty* in many of its posts:

14

Copy from re:SearchTX



*Facebook (Oct. 25,2019)*

4.15   Daniel Defense admits 90 percent of its purchasers are consumers that are not military trained. In other words, Daniel Defense knows the consumers buying its military style lethal weapons are not competent to responsibly use their guns as trained military personnel are capable of doing. In directing much of its advertising at young men and adolescents, Daniel Defense chose to target a group that was particularly susceptible to advertising and disproportionately likely to misuse Daniel Defense's products. Violent first-person-shooter video games like *Call of Duty* allow Daniel Defense to indirectly market the firepower of their DDM4 rifles to teenagers and young adults through product insertion and realistic depictions of the rifle. The allure of the video game is that it allows users to experience extreme carnage through fantasy killing. Games like *Call of Duty* are popular among teenagers and young adults, including the Uvalde, Parkland, and El Paso mass shooters. And Daniel Defense has benefited from the use of AR-15-style rifles in *Call of Duty*. In social media posts, Daniel Defense uses hashtags such as

15

Copy from re:SearchTX

### *DANIEL DEFENSE KNOWS THEIR WEAPONS ARE USED BY CIVILIANS IN MASS SHOOTINGS.*

4.16    It has long been recognized that providing those under the age of 21 with access to deadly weapons and ammunition poses a grave and unacceptable risk to public safety. For this reason, federal law, and many state laws, restrict access to both firearms and ammunition to juveniles and minors. As the Senate Report accompanying the passage of the Federal Gun Control Act in 1968 noted, "[t]he clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country."[2]  Plaintiffs acknowledge that in today's world, groups of violent individuals are known to enter homes and that a rapid-fire weapon may be appropriate for defense of home and family.  However, few 18-year old's have either homes or families and as such they have little need for these types of weapons.  Certainly, the gun manufacturers should, at a minimum, require proof of age and require the deliverer to report suspicious activity.  Failure to determine the age of the purchaser is certainly negligent.

4.17    Firearm manufacturers know or should know as marketers and sellers of the weapons and systems used to modify an automatic weapon, the dangers of providing firearms and ammunition to individuals under  the age of 21, certainly under the age of 18; and the ease of customizing an AR 15 rifle.

4.18    The following are examples of mass shootings covered by the mass media and which provide common knowledge and notice to manufacturers and retailers of AR rifles of their potential for misuse.

---

[2] S. Rep. No. 90-197, at 79 (1968).

16

a)  The Columbine High School shooting perpetrated in 1999 by a 15-year-old and an 18-year-old; resulting in the deaths of 13 people, including 12 students, wherein an AR 15 was used;

b)  The Sandy Hook Elementary School Shooting in 2012 by a 20-year-old, killing 26 people, including 20 -first grader;

c)  The Marjory Stoneman Douglass Shooting in 2018 by a 19-year-old, killing 17 people and injuring 17 others, wherein an AR-15 was used;

4.19    Between 2009 and 2022, the six deadliest mass shootings in the U.S. all involved the use of assault weapons and/or high-capacity magazines: Las Vegas (58), Orlando (49), Newtown (27), Sutherland Springs (26), El Paso (23), and Uvalde (21). Assault weapons with high-capacity magazines are disproportionately used in public mass shootings. Of the shootings where the type of weapon is known, 76 percent of those involved an assault weapon and/or high-capacity magazine that occurred in public; compared to 44 percent of those that involved a handgun.[3]

4.20    These mass shootings are just a fraction of all the shootings committed by juveniles and minors. 18 to 20-year-olds are offenders in gun homicides at a rate nearly *four times higher* than adults 21 and older. Nevertheless, or perhaps as a result of this, gun makers and sellers aggressively market directly to young adults and do everything they can to attract their attention through advertising, even going so far as using youth culture icons such as Star Wars, Fortnite, and Call of Duty in their marketing. Gun makers and sellers deliberately push their lethal weapons into the hands of unpredictable, emotional, and volatile young adult civilians knowing that it is reckless, absurd, and dangerous to the public. Gun makers and sellers understand their market audience. They target audience preferences, activities, and characteristics, and are keenly aware of

---

[3] Everytown Research & Policy, Mass Shooting in America (as of August 15, 2022)

17

Copy from re:SearchTX

the vulnerabilities and emotional variability of the young adult minds they target.  The sales to adults may be legal but the sales to minors are those who display dangerous qualities certainly violate their duties to Plaintiffs and are negligent.

4.21   AR-15 style, assault weapons with their rapid-fire large ammunition capacity, are time and time again the weapon of choice for mass shootings. Four of Daniel Defense's semi-automatic rifles were part of the arsenal of firearms used by the shooter that killed 60 people in Las Vegas in 2017. Smith & Wesson's assault weapons also purchased by the Uvalde school shooter have been used in some of the worst mass shootings in U.S. history including:

a.  2022 Fourth of July shooting in Highland Park, Illinois where Robert E. Crimo III, age 21, murdered 7 people using a Smith & Wesson M&P15 he purchased online.[4]

b.  2018 Stoneman Douglas High School shooting in Parkland, Florida where Nikolas Cruz, age 19, murdered 17 people. All victims were shot in under four minutes.

c.  2015 San Bernardino, California shooting where terrorists murdered 14 people using AR-15 style rifles, including a Smith & Wesson M&P15. [5]

d.  2012 Aurora, Colorado theater shooting where James Holmes, age 25, murdered 12 people using several guns including a Smith & Wesson M&P15, with a 100-round drum.[6]

### *DANIEL DEFENSE DELIBERATELY STAYS IGNORANT OF THE HUMAN HARMS AND LOSSES RESULTING FROM ITS RECKLESS MARKETING PRACTICES.*

4.22   Daniel Defense knows their assault weapons land in the hands of mass shooters but apparently stays ignorant to the number of killings and crimes caused by their weapons and their

---

[4] *Highland Park Suspect Robert Crimo Bought Rifle Used in Attack Online*, New York Post (July 6, 2022); *Illinois State Police Director Defends Decision to Give Suspected Highland Park Killer a Gun Permit in 2020*, Chicago Sun Times (July 6, 2022).
[5] *Guns Used in San Bernardino Shooting Were Purchased Legally from Dealers*, Washington Post (Dec. 3, 2015); *Florida Gunman Had Extra Ammo at School, Fired for 3 Minutes*, Associated Press (Feb. 15, 2018).
[6] *Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol,* The New York Times (July 23, 2012).

18

Copy from re:SearchTX

direct marketing to vulnerable and/or young adult consumers. Daniel Defense chooses not to do any studies evaluating the effects of their marketing strategies on the health and well-being of Americans and chose not to look at the cost to families and communities like Uvalde, Texas. Gun makers mistakenly believe they have blanket immunity against civil lawsuits under PLCAA,[7] discussed *infra*, and exploits the heightened susceptibility of teenage boys and young men to produce advertising that plays on this group's propensities for risky and violent behavior.

4.23    Daniel Defense's prior CEO and founder, Marty Daniel, makes no apologies for his company's place in the marketplace and the benefits he gains from tragedy and mass shootings. Mr. Daniel proudly told Forbes Magazine in 2017 that its sales went up after the mass shooting at Sandy Hook Elementary in 2012. Like the Uvalde school shooter, the Sandy Hook shooter was a young adult, 20 years old. Unlike other product manufacturers, Defendants herein named are consciously indifferent to the human harm and losses caused by their intentional sales and marketing practices, especially to minors or young adults.  While Plaintiffs are <u>not</u> advocating for or suggesting that these weapons be banned, they are suing Defendants for their negligence and deceptive marketing.

4.24    Daniel Defense could stop marketing to and glamorizing guns to children and young adults and enact more prudent merchandising and marketing policies but chooses not to. Daniel Defense could provide educational marketing to the public but chooses not to. It could analyze the crime and death caused by its weapons and their role in mass shootings and the role their advertising plays but chooses not to.  In fact, Daniel Defense does not require any type of age

---

[7] Protection of Lawful Commerce in Arms Act, 15 U.S.C. 7902 *et seq.*

Copy from re:SearchTX

or identity document, included, but not limited to a driver's license, passport, or government issued identification. Such failures, if not criminal, are certainly negligent.

4.25    Daniel Defense knows marketing to children and young adults is not in the public interest and increases the risk of death to Americans and children, but such a practice has proved profitable to the Company. While Daniel Defense places profits over people they are in violation of foreseeable duties to Plaintiffs and moral duties as humans. Daniel Defense knows that doing so leads to mass shootings using their weapons. Daniel Defense makes millions off the sale of assault weapons especially after a mass shooting. Daniel Defense consciously chooses profits over the safety and lives of Americans. In the years before the Uvalde school massacre, Daniel Defense did nothing to curtail the marketing and sale of guns to untrained American youth, seeking thrills, notoriety and fame. Its business practices are reckless, deliberate, intentional, and needlessly endanger American children.

4.26    Daniel Defense knows AR-15 style, semi-automatic rifles are unsuited for recreation or casual use and possession. The origin of the AR-15 is the military M-16, and specifically designed to kill multiple people fast. Daniel Defense knows its strategy of marketing directly to youth enables untrained civilians as young as 18 years old (or younger) the power and ability to inflict unparalleled human carnage on unarmed and unprotected civilians and children. The Uvalde school shooter seamlessly bought the AR-15 style rifle directly from Daniel Defense via its eCommerce website without even a passing inquiry as to his age and had the firearm shipped directly to Uvalde, Texas to its supplier Oasis Outback. Daniel Defense has done nothing to protect Americans against their reckless marketing and business practices.  Daniel Defense's marketing is deceptive, misleading and violates the Texas Deceptive Trade Practices Act.

Copy from re:SearchTX

**_DEFENDANTS FIREQUEST INTERNATIONAL/ FLASH CO.  AND THE HELL-FIRE TRIGGER_**

4.27    The Hell-Fire trigger system, nearly identical to a bump stock, allows a rifle to fire at a rate like a fully automatic weapon. The bump stock device was banned after the 2017 Las Vegas mass shooting, but the Hell-Fire trigger systems is still legal. However, being legal and being negligent are not the same thing.  The Hell-Fire trigger system clamps to a trigger guard behind the AR-15 trigger and presses a "finger" against the back of the trigger to increase the force that returns the trigger to its forward position, effectively decreasing the time required for the trigger to reset, allowing for a faster follow up shot. The Hell-Fire converts an otherwise semiautomatic firearm into a virtual automatic weapon so a shooter can continue firing (even with one hand) without additional physical manipulation of the trigger. The Hell-Fire trigger  firearm modifier  transforms  a semi-automatic firearm to one that can fire at a rate approaching that of a fully automatic firearm. The system installs invisibly within the pistol grip on any AR-15 style rifle and can be activated or deactivated in seconds. The system permits the shooter to have a firmer grip on the gun and stock for increased accuracy and pull the firearm trigger at a modified rate of 900 rpms. In other words, the Hell-Fire trigger gives machine gun power to a civilian *legally*.

4.28    Upon information or belief, Firequest, the manufacturer of the Hell-Fire Gen 2 Trigger System, states on their online website, "All you have to do is squeeze the trigger to shoot at rates up to 900 rpm," which is comparable to AR-15s with bump stocks that can fire between 450 and 900 rounds per minute. Firequest also claims the Hell-Fire Gen 2 is "ATF legal and compliant" and is sold with a "certificate of legality." Firequest further touts, "It is revolutionarily the best rapid-fire system for these new volatile times. Get them now before new laws outlawing."

21

Copy from re:SearchTX

YouTube videos linked to Firequest's website and product page for the Hell-Fire Gen 2 depict an AR-15 rifle with the Hell-Fire Gen 2 trigger system firing as a fully automatic rifle.



*Advertisement for the Hell-Fire Trigger Device*

4.29    Firequest had knowledge that the Hell-Fire system was used to facilitate school shootings with modifications to make AR rifles automatic weapons and shoot like machine guns. The "Hell-Fire"  name and advertising were used in a manner to appeal and encourage young men to commit violent acts and murder by using the weapon. The Plaintiffs believe, beginning in February 2022, the Uvalde shooter purchased the Hell-Fire Generation 2 trigger System through an online purchase for at-home shipping delivery, and further, that it is reasonable to assume, that the Hell-Fire device was delivered to his home address. The Plaintiffs further allege that the device was purchased by a debit card in his name and/or his grandmother's name. It is believed the Hell-

22

Copy from re:SearchTX

Fire trigger system was transported via FedEx Ground Service who facilitated the transfer to the shooter. Upon information and belief, the Firequest Defendant designed, manufactured, marketed, and sold an accessory trigger system, Hell-Fire Gen 2, that is used to convert a semiautomatic rifle into the equivalent of a machine gun to the Uvalde Shooter. In the alternative, Plaintiffs are also led to believe that Defendant FLASH Co. were also responsible for the design, manufacture, marketing, and may, in the alternative, have sold the accessory trigger system, Hell-Fire Gen 2, to the Uvalde Shooter.

### *THE YOUNG, UVALDE SCHOOL SHOOTER*

4.30    Salvador Ramos was a troubled and violent young man. In the fall of 2021, Ramos was 17 years old, but he had only progressed as far as ninth grade in school. As a result of poor academic performance and attendance, he was involuntarily withdrawn from Uvalde High School on October 28, 2021. Following his withdrawal from high school, Ramos became increasingly socially withdrawn. His relationship with his girlfriend ended, and he began harassing his ex-girlfriend and her social circle. His few remaining friends teased him that he would become a school shooter. He became fixated on notoriety.

4.31    The shooter had a history of mental and behavioral problems and would cut up his face with knives for fun.[8] Uvalde PD was called multiple times due to conflicts between the shooter and his mother.[9] He would drive around with another friend at night to shoot at random people with a BB gun or egg their cars.[10] He wore all black, had long black hair, and wore large military

---

[8] Robert Klemko et al., *Gunman bought two rifles, hundreds of rounds in days before massacre*, The Washington Post (May 25, 2022), https://www.washingtonpost.com/nation/2022/025/uvalde-texas-school-shooting-gunman/.
[9] *Id.*
[10] *Id.*

23

Copy from re:SearchTX

boots.[11] The shooter once commented to a friend he wanted to join the Marines to kill people.[12] While any of these alone may not raise concern; together they paint a dangerous picture that was ignored by all with a duty to notice them and act upon that notice.  Negligence of those with a duty to not harm others is clear.  The many companies that did nothing or encouraged the carnage is negligence. What is clear is that the picture of Salvador Ramos is not that of anyone who would or should want to sell the firearms or ammunition he purchased over the last six months to a year prior to May 24, 2022.

4.32    The shooter used Yubo and Instagram to send sexually aggressive comments, and threats of kidnap, rape, and death.[13] Multiple teens reported the violent threats made by the account alleged to be the shooter's, but nothing ever came of it.[14] In one chatroom, the shooter bragged about buying his guns and then said that "girls deserved to get raped." In late 2021, the shooter ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn on the day of the Robb Elementary School massacre.[15] He asked friends and family members to buy guns for him since he was underage. [16]

4.33    According to Department of Public Safety Director Col. Steven C. McCraw, there was a discussion on Instagram on February 28, 2022, about Salvador Ramos being a "school

_____

[11] *Id.*

[12] *Id.*

[13] Alyson Klein, *The Uvalde Shooter Posted Threats on Yubo. What to Know About the App and Others Like It*, Education Week, (June 2, 2022), https://www.edweek.org/leadership/the-uvalde-shooter-posted-threats-on-yubo-what-to-know-about-the-app-and-others-like-it/2022/06

[14] Silvia Foster Frau, Cat Zakrzewski, Drew Harwell, & Naomi Nix, *Before Massacre, Uvalde Gunman Frequently Threatened Teen Girls Online*, The Washington Post, (May 28, 2022).

[15] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 33 (Tex. 2022).

[16] *Id.* at 34.

Copy from re:SearchTX

shooter."[17] Ten days before the shooting, he messaged an individual, "10 more days," to which the person responded, "are you going to shoot up a school or something?" Ramos responded, "No, stop asking dumb questions. You'll see."

4.34    The shooter networked with local peers in ongoing group chats on Snapchat, and played a range of videogames, including the Call of Duty and Grand Theft Auto series, which glamorize guns and encourage murder. Most of his usernames and even his email address reflected themes of confrontation and revenge. The shooter demonstrated interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online.[18]

4.35    In early 2022, Ramos began making plans to carry out a school shooting in Uvalde. At the time he started planning, Ramos was 17 years old and thus could not legally purchase guns or ammunition. He asked other people to buy guns for him, which they refused to do. Instead, he began purchasing accessories, including large-capacity magazines, a holographic weapon sight, and a Hell-Fire trigger system, which dramatically increases the rate of fire of a semiautomatic firearm and makes it operationally similar to a fully automatic firearm. He searched online for how to purchase "juggernaut armor," which exists only in *Call of Duty*.

4.36    Ramos was 18 years old on the day of the massacre. In the days before and after his 18th birthday, he bought (or took possession of), 2 AR-15 style, semiautomatic rifles, 60 30-round magazines, and over 2,000 rounds of ammunition. He collected tactical gear and ammunition well

---

[17] Julie Moreno, *There Were Warnings, Clues About Uvalde School Shooting from Social Media Posts, Investigators Say*, KSAT News, (May 27, 2022). https://www.ksat.com/news/local/2022/05/27/there-were-warnings-clues-about-uvalde-school-shooting-from-social-media-posts-investigators-say/
[18] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 32 (Tex. 2022)

25

Copy from re:SearchTX

before his birthday but could not purchase the firearms legally. He ordered and paid for the guns while still 17 but took possession after his 18th birthday. According to friends and family, he had no firearm experience and had never shot a gun until the massacre.

4.37    The Plaintiffs herein reasonably believe that sometime in March or April 2022, before the shooter was 18 years of age, he purchased at least one AR style rifle from Daniel Defense, an online retailer or merchant of firearms, without age identifications or proof of age being requested by Daniel Defense. Based upon the amount of time it would take to process the sale and to ship the weapon to Oasis firearms, it is reasonable to believe the sale was illegal (at least as to the transaction with Daniel Defense), as the shooter was underage. The purchased weapon was defective in that it was engineered to allow modification to permit the weapon to shoot as an automatic weapon by the Hell-Fire system. The Plaintiffs believe  that it is reasonable to assume that AR was purchased by a debit card in Ramos' name and/or his grandmother's name. The AR-15 was shipped via FedEx Ground or UPS to Oasis Outback. Plaintiffs believe the illegal weapons were transported via FedEx Ground Service or UPS, who facilitated their illegal transfer to Oasis and in turn to the shooter. No one questioned the age of the purchaser when Ramos actually paid for the guns to be transported.

4.38    On May 17, 2022, the day after his birthday, Oasis Outback transferred to Ramos a Smith & Wesson M&P15, AR-15 style, semi-automatic rifle. Oasis Outback is a local sporting goods store that also serves as a local firearms dealer to complete online purchases made directly from gun manufacturers. Oasis transferred the supposedly illegally purchased AR style rifle to the shooter, and such transfer was illegal for one, or more, of the following reasons:  Ramos was not 18 at the time of the on-line purchase; the shooter resembled a "shooter"; the shooter used a debit card; and the shooter appeared nervous and/or intoxicated.  ATF rules would require Oasis to not

Copy from re:SearchTX

sell to someone who they suspected is impaired or otherwise not qualified to own a firearm, especially a military style weapon.

4.39    On May 17, 2022, the shooter also purchased 1,740 rounds of 5.56mm 75 grain boat tail hollow points for $1,761.50 shipped directly to his house. The purchase of nearly 2000 rounds of ammunition by a person who just turned 18 and "looked like" a school shooter, and in fact earned that nick name from co-workers, did not raise an eyebrow on the part of the Defendants. Red lights, whistles and fire alarms would have gone off on the part of any responsible party.

4.40    On May 18, 2022, the shooter returned to Oasis Outback to buy 375 rounds of 5.56 caliber ammunition. Again, no alarm sounded. Despite the earlier purchase!

4.41    On May 20, 2022, the shooter returned to Oasis Outback to pick up another weapon, an AR-15 style semi-automatic rifle, DDM4 V7, which he bought directly online from Daniel Defense for $2,054.28. The gun had a 16-inch barrel and total gun length of 32 ¼" – 35 7/8." On this date, Oasis  illegally transferred the second AR rifle to the shooter.  The transfer was illegal again for one, or more,  of the following reasons:  the shooter was not 18 at the time of the purchase; the shooter resembled a "school shooter"; the shooter used a debit card; and the shooter appeared nervous and/or intoxicated. This was the shooter's second transfer of an AR rifle from Oasis within a matter of three days, that also should have caused concern.

Copy from re:SearchTX



*The Daniel Defense DDM4 V7 as seen on DanielDefense.com*

    4.42    Oasis Outback knew, or should have known, the shooter was suspicious and dangerous. Oasis Outback's owner talked to the shooter and asked him how he could afford $3,000 of guns and ammunition. The owner noticed the shooter was always alone and quiet, all warning signs of a mass shooter. Conveniently, after the shooting, the store owner now claims the shooter did not seem suspicious or raise any "red flags." However, store witnesses who saw the shooter at Oasis Outback buying expensive AR-15 style weapons and large amounts of hollow point ammunition told the FBI the shooter was "very nervous looking" and "appeared odd and looked like one of those school shooters." Another witness described the shooter's all black clothing as simply giving off "bad vibes." [19] While in today's world it is all too common to remain silent, the

---

[19] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 36 (Tex. 2022).

Copy from re:SearchTX

law requires Oasis and its employees to report what they observed.  Oasis was negligent in failing to follow the law and surely of negligence per se.

4.43    The Uvalde school shooters' background check may have been clean, but Oasis Outback sold him the guns and ammunition knowing he was suspicious and likely dangerous. Oasis did not notify anyone of the purchases of Ramos.  The store owner and his staff did not act on their suspicions and block the purchases or notify law enforcement. The shooter was able to assemble a lethal, military-grade assault weapon with a 30-round capacity magazine capable of pulverizing many people within minutes with no oversight, licensure, experience, or training. All up to this point because Daniel Defense, Firequest International, Flash Co., and Oasis Outback put their profits above safety.

### *THE UVALDE SCHOOL MASSACRE ON MAY 24, 2022*

4.44    The Uvalde school shooting was one of the worst shootings in Texas' history. The facts contained in this Complaint were compiled without access to police reports, video statements, or autopsy reports as no state agency nor federal agency responded to open records request nor Freedom of Information requests including the ATF, the Uvalde Independent School District, the District Attorney of Uvalde, the Texas Department of Public Safety, the City of Uvalde, The Uvalde Police Department; in an apparent concerted effort to deny the children and families of Uvalde Texas Due Process of Law; and an attempt to prevent United States Citizens information about what occurred and to help prevent such mass shootings in the future.

4.45    On the morning of May 24, 2022, the shooter sent a Facebook private message to a girl in Germany telling her he shot his grandmother in the head and would shoot up the elementary school.

Copy from re:SearchTX



*Private message from Ramos on Facebook May 24, 2022*

4.46    Shortly after Ramos shot his grandmother in the face, he stole her vehicle and drove to nearby Robb Elementary School. The shooter's grandmother called Uvalde PD.

4.47    At 11:28 a.m., the shooter crashed his grandmother's truck into a dry ditch near the school. Two people from nearby Hillcrest Memorial Funeral Home approached the crash scene at 11:29 a.m. and ran when the shooter shot at them with his rifle. The witnesses called 911.

30

Copy from re:SearchTX



*Aerial map of Robb Elementary School*

4.48     At 11:30 a.m., the shooter, wearing dark clothing and carrying a bag, left the crash scene and climbed a five-foot chain-link fence onto the school property and walked across the open grounds between the fence and the teachers' parking lot towards the school buildings on the west side of the school campus.

4.49     At 11:32 a.m. the shooter reached the west teachers' parking lot adjacent to the building and fired shots through windows into the westmost classrooms before entering the building.

4.50     Armed with at least one AR-15 semi-automatic assault rifle, modified to automatic status, b o d y   a r m o r,  and hundreds of rounds of ammunition, the acts of the shooter were premeditated, and intentional.

4.51     The shooter entered the school through Robb Elementary Schools' west side as children were in the school celebrating their last day of class before the summer break at approximately 11:33 a.m. The back door and lock at Robb Elementary were defective and/or the product of various manufacturing defects. Video footage from inside Robb Elementary showed

31

Copy from re:SearchTX

the shooter open and enter the school building unabated. It is unknown what would have happened of the door lock had worked but certainly it would have either delayed the shooter or even prevented the shooting.  It was originally reported that the door had been left unlocked but that was not the case, the lock was defective.

4.52    Twenty-four seconds after the shooter entered the school and walked down the hallway, he shot into the classrooms spraying over 100 bullets in 2 ½ minutes killing and injuring many innocent victims. There were no school district police inside the school.



*The Texas Department of Public Safety diagram*

32

Copy from re:SearchTX

4.53    At 11:33:24 a.m., the shooter fired rounds from the hallway toward classrooms 111 and 112.

4.54    At 11:33:32 a.m., he entered classroom 111, which was unlocked.  The rate of fire was initially very rapid then slowed, lasting only a few seconds.  The sound of children screaming was removed from video recordings released to the public.

4.55    At 11:33:37 a.m., the shooter backed out of classroom 111 into the south hallway and fired shots from the hallway into classroom 112. The shooter then re-entered classroom 111 and continued the shooting spree. The shooter fired over 100 rounds by 11:36 a.m., according to audio analysis.  The shooter barricaded himself within the third and fourth-grade classrooms 111 and 112. The modified AR rifle used by the shooter resulted in the inability of people to flee; shortened the time needed to kill this number of children; and made police action largely ineffective as the children were shot within one to three minutes of the shooter entering the school. All of those made the lock very important.

4.56    At 12:50:03 p.m., 77 excruciating minutes after the massacre began, U.S. Border Patrol officers breached the door of Room 111 and fatally shot the shooter.

4.57    During the time between the shooter first reaching Robb Elementary campus until he was shot, the students, teachers, and parents all were held hostage or kidnapped not knowing who was next to lose their life or what friend or family member has breathed their last.  The kidnapping, hostage-taking, injuries and killing were the result of the combined negligence of the Defendants in an amount to be determined by the jury.

4.58    The shooter killed nineteen students and left two teachers nearly dead or dying in a reign of terror that terrorized and traumatized all of the children at Robb Elementary. These children and individuals will never be free of the trauma they experienced, will have increased

33

Copy from re:SearchTX

suicide rates, increased drug abuse and alcoholism, a higher percentage of failed marriages and generally difficult lives. The combined actions (negligence) of the Defendants have resulted these children, their parents and families of their future and the futures of their children, husbands, wives, girlfriends, and boyfriends.

4.59    This mass shooting was caused and/or approximately caused by the unlawful and negligent actions of the Defendants. The marketing, sales, and transfer of these weapons and modification devices was negligent and/or negligent per se.

**THE DEFENDANTS ARE NOT SHIELDED FROM LIABILITY BY THE PROTECTION OF LAWFUL COMMERCE IN ARMS ACT ("PLCAA").**

4.60    The Defendants cannot abate responsibility for this massacre and attempt to hide behind The Protection of Lawful Commerce in Arms Act, 15 U.S.C. Sec. 7901, *et. seq.* ("PLCAA"). The PLCAA prohibits injured parties from suing gun manufacturers or dealers for personal injuries solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

4.61    PLCAA is not an absolute bar but is an affirmative defense. Plaintiffs' claims against the Defendants are not prohibited by PLCCA, but expressly allowed. PLCAA allows narrow protection from some claims, while expressly permitting other claims based upon the unlawful or negligent actions of the gun dealer or manufacturer, or violation of a state or federal statute applicable to firearms.

4.62    The Defendants negligently transferred and supplied their lethal products to the Uvalde school shooter when they knew or should have known the shooter was likely to, and did, use the products in a manner involving unreasonable risk of physical injury to others. *See.* 15 U.S.C. § 7903(5)(B).

34

Copy from re:SearchTX

4.63    The Defendants' PLCAA immunity is further pierced as they were negligent, negligent per se in their regard to marketing, promoting, advertising, sale, and distribution of unreasonably dangerous weapons and equipment. It has long been recognized that providing those under the age of 21 with access to deadly weapons and ammunition poses a grave and unacceptable risk to public safety. For this reason, federal law, and many state laws, restrict access to both firearms and ammunition to juveniles and minors. This claim is substantiated by the letter from twelve United States senators to the Federal Trade Commission, which is further evidence of false, deceptive, and misleading advertising which regulates the Defendants from the protection of the act.

## CAUSES OF ACTION:
## NEGLIGENT TRANSFER AND SALE AS TO ALL DEFENDANTS

5.1     The Defendants were all subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risk of injury.

5.2     The Defendants have a duty to exercise reasonable care in selling and/or shipping firearms, firearm gear, and ammunition, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others. In fact, companies that sell or deliver firearms and ammunition have an obligation to exercise the highest duty of care in transferring these products because of the potential for harm if firearms and ammunition get in the wrong hands.

5.3     On May 17, 2022, and May 20, 2022, Oasis Outback sold Two AR-15 style rifles and hundreds of rounds of ammunition to the freshly 18-year-old shooter. Upon information and belief, one of the AR-15 semi-automatic assault rifle was manufactured and sold by Daniel Defense.

35

Copy from re:SearchTX

5.4     The shooter also purchased the AR-15 Rifle trigger attachment device, the Hell-Fire, from Defendant Firequest International Inc. and/ or Flash Co. The Hell-Fire Stealth system attachment permitted Ramos to transform his semi-automatic AR-15 semi-automatic firearm to fire at a rate approaching that of a fully automatic firearm.

5.5     The  Defendants had actual knowledge' of the shooter's mental condition or his intentions, and reasonably should have known about his purposes in making his purchases: (1) Daniel Defense did not qualify the shooter for age; (2) did not distribute through a retail shop; and (3) Oasis Outback illegally transferred the weapon; (4) Oasis Outback illegally transferred the weapon knowing it was an illegal purchase as the shooter was under 18 years of age; (5) Oasis Outback transferred the weapon to a shooter under 18 years of age at the time of purchase knowing that the AR-15 semi-automatic firearm could be easily modified.

5.6     The Defendants had, at all relevant times, actual or constructive knowledge the AR-15 style rifle and modifiers sold to the Uvalde school shooter had no reasonable application to lawful uses of firearm (such as military or self-defense) but instead were well-suited and/or intended for misuse.

5.7     The Defendants had, at all relevant times, actual or constructive knowledge that young adult males are most commonly the perpetrators of mass shootings, including school shootings, and had or should have had actual knowledge at all times of the Uvalde school shooter's date of birth and gender. The failure to determine the age of the shooter is a violation of their duty to Plaintiffs.

5.8     Oasis Outback, the owner, and its staff, had actual knowledge of the Uvalde school shooter's characteristics and dangerous propensities. Oasis Outback sold two AR-15 style rifles and 375 rounds of ammunition to the shooter on May 17, May 18, and May 20, 2022, and installed

36

Copy from re:SearchTX

a holographic sight on the Daniel Defense AR-15 rifle the shooter used in the shooting. Oasis Outback's owner talked to the shooter and asked him how he was able to afford $3,000 of guns and ammunition. Obviously, the shooter and his purchase raise a red flag that the owner failed to follow yet another breach of duty. The owner noticed the shooter was always alone and quiet. Store witnesses told the FBI the shooter was "very nervous looking" and "appeared odd and looked like one of those school shooters." Another witness described the shooter's all black clothing as simply giving off "bad vibes." Despite the shooter's young age, inexperience, appearance, display of dangerous characteristics, and profile of a young adult school shooter, Oasis Outback sold the AR-15 rifles and ammunition to him just days after his 18th birthday. Oasis Outback, its owner, and staff, knew, or should have known, due to the shooter's age, inexperience, appearance, demeanor, and display of young school shooter characteristics, the shooter intended to use the guns and ammunition to injure and kill people.  Moreover, Oasis Outback has the right to refuse service to anyone.

5.9    All Defendants had a duty not to transfer and sell a lethal weapon to a person having and/or displaying dangerous propensities or indicating a propensity to harm and kill others. Oasis Outback is a licensed seller of firearms. It sold ammunition and a firearm to the shooter when it knew, or reasonably should have known, that the person to whom the ammunition and firearm being supplied, the shooter, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons; and in fact, Ramos did so use it.

5.10    This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

5.11    At all times material to this suit, the Defendants, owed Plaintiffs a duty of reasonable care to ensure the safety, care, and well-being of the public, including Plaintiffs, and

37

had or assumed a duty to exercise reasonable care in executing such duties. Defendants failed to exercise reasonable care, and such failure was negligent and a proximate cause of the incident in question and resulting damages to Plaintiffs. These acts or omissions include, but are not limited to, the following:

a)      Failing to protect the safety of the public, including the Plaintiffs;

b)      Failing to follow the laws of Texas in Selling AR-15 semi-automatic rifles, firearm attachments, and ammunition to the mass shooter.

c)      Failing to enact and follow reasonable policies and procedures for selling firearms and equipment;

d)      Failing to properly follow applicable law in the marketing and sale of firearms, firearm modifiers, and ammunition;

e)      Failing to attempt to recover the illegal weapons and equipment sold to the mass shooter after the sale;

f)      Intentionally blinding themselves to a purchaser who appears to be emotionally disturbed or suffer from violent fantasies;

g)      Selling firearms, firearm attachments, and copious ammunition to Defendant Salvador Ramos without inquiring into his health and well-being;

h)      In failing to pay attention or reasonably respond to Salvador Ramos' emotional disturbance;

i)      In failing to inform law enforcement that Defendant Salvador Ramos was emotionally disturbed and harboring violent fantasies.

j)      Plaintiffs will show other ways determined during discovery in this matter.

5.12    The Defendants are vicariously liable for the actions or inactions of its agents/employees while acting within the scope of their agency and/or employment.

5.13    As a proximate cause of the Defendants' sale and transfer of guns, ammunition, and accessories to the shooter, the shooter was able to acquire and misuse the weapons causing the school massacre on May 24, 2022. The Uvalde school shooting was a foreseeable consequence of the Defendants' negligent sale and transfer of the weapons to the shooter. The Defendants'

38

Copy from re:SearchTX

negligent sale and transfer of the weapons to the shooter caused the Plaintiffs to suffer, and continue to suffer, physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of life.

5.14    As a proximate cause of the Defendants' negligent sale and transfer, Plaintiffs have suffered and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## PRODUCTS LIABILITY- MANUFACTURING DEFECT AS TO DANIEL DEFENSE, FIRQUEST INTERNATIOANL, AND FLASH CO.

5.15    At all relevant times, Defendants researched, tested, developed, manufactured, marketed, sold firearms, firearm equipment, modifiers, and attachments. At all relevant times, the Defendants designed, marketed, sold, firearms, firearm equipment, modifiers, and attachments. The defendants' products deviate, in their construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.

5.16    Based on information and belief, Defendants' products were defective and unreasonably dangerous because the firearms and equipment they designed, marketed, and sold could be modified into a military -type automatic weapon. The products were defective when they left the hands of the manufacturer because an AR-15 could be so easily modified to become a machine gun-like product that fires rapidly with an additional "trigger" akin to a military-style rifle, so that an individual with no experience in handling rifles can fire over 100 rounds per minute, as a non-expert is a defect.

5.17    Defendants are liable to Plaintiffs for injuries caused as a result of their products' manufacturing defects.

Copy from re:SearchTX

5.18    The products' defects were substantial and a proximate cause of Plaintiffs' injuries.

5.19    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

**PRODUCTS LIABILITY- MARKETING DEFECT AS TO ALL DEFENDANTS**

5.20    The Defendants aggressively market lethal weapons to youth, civilians, and young adults they know are not competent by maturity, skill, training, or experience to responsibly use an assault weapon such as an AR-15 style rifle, with high-capacity magazines and trigger systems and appreciate the risk of harm to others. The Defendants have actual or constructive knowledge that AR-15 style rifles, rapid-fire trigger systems, and high-capacity magazines are used by most often by young adults in mass shootings. The Defendants have actual or constructive knowledge that young adults, due to the process of brain development and biological maturation are not competent emotionally to safely use their products without adequate training, guidance, and/or supervision and/or within the setting of a safe and supervised environment. The Defendants further have actual or constructive knowledge that the young adult civilian consumers its sells to and/or targets do not have the experience or expertise to appreciate the risk of harm to others if proper warnings, training, guidance, and instruction is not provided.

5.21    The Defendants' products fail to warn civilian and young adult consumers that adequate training, guidance, and/or supervision is necessary to ensure the safe use of their products. Because of the age, inexperience, and vulnerability of the young adult civilian consumers adequate training, guidance, instruction, precaution, and supervision is necessary for safe use of

40

Copy from re:SearchTX

the products. A risk of harm was inherent in the defendant's product or might arise from the intended or reasonably intended use of the product.

5.22    The Defendants' products fail to warn young adult consumers that use of their products by young adult consumers carries a high risk of harm to self and others given the emotional, physical, and psychological development changes of young adults resulting in mood and behavior instability and volatility.

5.23    As a result of Defendants' marketing defects, Defendants products were defective and unreasonably dangerous when they left the possession and/or control of Defendants and used by the Uvalde school shooter on the day of the school shooting. The defendants knew or could reasonably foresee the risk of harm at the time the product was marketed. The lack of instructions or warnings rendered the product unreasonable dangerous to the ultimate user or consumer of the product, and the failure to warn or instruct caused the Plaintiffs' injuries.

5.24    As a proximate cause of Defendants' marketing defects, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental healthcare visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

### TEXAS DECEPTIVE TRADE PRACTICES ACT AS TO ALL DEFENDANTS.

5.25    The Deceptive Trade Practices Act (DTPA) prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." DTPA § 17.46 (a).

5.26    The Plaintiffs named herein are "consumers" as required by the DTPA.

5.27    The Defendants have marketed firearms and firearm products to consumers as a safe and proven product to protect themselves and their homes. Consumers should be informed of

Copy from re:SearchTX

all the substantial and unavoidable risks that come with firearms and firearm modifier ownership, possession, and use. The Defendants' marketing and advertising made material misrepresentations that were false and misleading.

5.28    Defendants, as alleged above, are engaging or have engaged in false, misleading, or deceptive acts or practices in the conduct of trade or commerce, in violation of DTPA 17.46(b) as follows: a. "[R]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not," DTPA § 17.46(b)(5)); and b. "[F]ailing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed," DTPA § 17.46(b)(24). And c. causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services in violation of DTPA § 17.46(b)(2).

5.29    The Defendants have, by means of these unlawful acts and practices, obtained money from consumers who are entitled to restitution, or in the alternative, has caused actual damages to identifiable persons who are entitled to compensation.

5.30    As a proximate result of the Defendants' conduct, which contributed to Plaintiffs' injuries and death, Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court. Because Defendants have engaged in the unlawful acts and practices described above, Defendants have violated the law as alleged herein.

Copy from re:SearchTX

## VI. DAMAGES
## DAMAGES AS TO ALL PLAINTIFFS

6.1     As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

6.2     As a proximate cause of Defendants' conduct, the adult Plaintiffs, parents and guardians, of the children present at the shooting at Robb Elementary School suffered loss of consortium and/or companionship with their children, emotional stress, lost wages on the day of the shooting, lost wages as to time off from work to take their children to medical, psychological, and psychiatric problems, and emotional problems such as loss of sleep, weight gain and/or weight loss, additional time to devote to their children's emotional needs, and will continue to incur these losses and expenses in the future.

6.3     As a proximate cause of Defendants' conduct, the children present at the shooting at Robb Elementary suffered emotional stress; physical and emotional damages; increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

6.4     The Plaintiffs, that is the adults and their children, suffered non-economic damages, that are, mental or emotional pain or anguish, loss of consortium, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than actual damages.

43

Copy from re:SearchTX

6.5     Special damages arising from acts which are foreseeable.

6.6     Prejudgment interest.

6.7     Post-judgment interest

6.8     Reasonable and necessary medical expenses.

6.9     Future medical expenses reasonable probability that they will incur in the future.

6.10    Mental pain and suffering; that is, Mental anguish more than anguish and resentment grief, severe disappointment, indignation, wounded pride, shame despair, public humiliation; severe disruption in daily routine; and foreseeable Bystander anguish.

6.11    As to the parents and guardians: loss of Consortium of parent-child relationship; that is, loss of companionship which is relatively severe to affect relationship with their children.

6.12    Subsequent aggravation by plaintiff or third-party recoverable traceable to primary negligence cut off:

a) Past medical expenses;

b) Future medical expenses;

c) Pain and suffering in the past;

d) Pain and suffering in the future;

e) Mental anguish in the past;

f) Mental anguish in the future;

g) Bystander damages;

h) Lost wages;

i) Prejudgment interest;

j) Post judgement interest;

k) Exemplary damages;

44

Copy from re:SearchTX

l)  Loss of enjoyment in life in the past;

m) Loss of enjoyment in life in the future;

n)  Other reasonable consequential damages.

6.13    Personal injury damages including loss of wage-earning capacity in the future, medical expenses, mental anguish, and damages to the person of each plaintiff.

6.14    Plaintiffs herein suffered injuries due to the events that occurred on May 24, 2022. These injuries include, but are not limited to, post-traumatic stress disorder, fear, nightmares, extreme anxiety, depression, and insomnia. In all reasonably probability, Plaintiffs will continue to suffer in this manner for a long time into the future, if not for the remainder of their natural lives. The injuries have had a serious effect on bystander mental anguish for the injuries caused to third person, by a closely related person, mental anguish for a family member, which listed in the wrongful death act; reasonable without proof of physical injury suits based upon an intentional or willful act; disfigurements scarring, amputations deformity changes in appearance; can be proved by plaintiffs testimony and inspection by the jury; physical impairment loss of enjoyment of life- loss of Plaintiff's former lifestyle, including loss of ability to play sports, have a normal social life loss of service increase capacity of the injured spouse to perform household services in to administer to the needs of the other spouse and family evidence of what services the spouse cannot perform.

6.15    Loss of service of minor child, and the evidence of minors and their capacity to perform services, which may be inferred from child's personality and family relationships.

6.16    Actual damages to repair the wrongs or to compensate for severe physical injuries.

6.17    "Compensatory damages", that is economic and noneconomic damages.  The term does not include exemplary damages.

6.18    "Future damages" means damages that are incurred after the date of the judgment.  These include medical bills, loss of wages, impaired earning capacity.

45

Copy from re:SearchTX

6.19    "Future loss of earnings" means a pecuniary loss incurred after the date of the judgment, including loss of income, wages, or earning capacity, and loss of inheritance.

6.20    The specific elements of damages suffered by each Plaintiff will be fully described during the discovery process.  The Plaintiffs preserve the right to plead additional and more specific damages in the future as more facts become known. The above-mentioned elements of damages are those that Plaintiffs have suffered in the past up to the time of trial, but in addition, those that they, in reasonable probability, will continue to suffer in the future.

6.21    The Plaintiffs intend to and will amend their Original Petition to more specifically document the mental anguish and pain and suffering claims of the hostage clients, including listing those Plaintiffs who suffered physical injuries during the hostage ordeal or in escaping from it.  These include the "special needs" child who was instructed to run as far from the school as she could and was located hours later by her father 2-3 miles from the school unsure what had happened, frightened, abandoned and alone, afraid everyone she relied on had been filled.

### DAMAGES AS TO PLAINTIFF DAVID TREVINO, INDIVIDUALLY AND AS NEXT FRIEND OF I.T. A MINOR (11 YEARS OF AGE)

6.22    Prior to the hostage, kidnapping situation, I.T. was a healthy, normal, 11-year-old. As a result of the damage inflicted upon her by Defendants, she has suffered severe personal injuries including the onset of heart problems directly attributed to the Defendants actions. She has also exhibited self-harming behavior, been under suicide watch and hospitalized as a result of mental anguish, anxiety, suicidal tendencies, depression and the overall deterioration of her health. Prior to the incident she had not and was not suffering from any of these conditions.

6.23    David Trevino is entitled to seek damages for the pain, suffering, and mental anguish he suffered, including the damages incorporated herein stated above, but also actual damages to repair the wrongs or to compensate for severe physical injuries. Also, the mother seeks damages both individually and to the family relationship through her husband, David Trevino.

46

Copy from re:SearchTX

6.24    General damages which are the unusual accompaniment of this particular type of wrongdoing, that is the Plaintiff has incurred extreme physical suffering and disability, and loss of employment.

6.25    Special damages arising from acts which are foreseeable.

6.26    Reasonable and necessary medical expenses.

6.27    Future medical expenses reasonable probability that they will incur in the future.

6.28    Physical pain and suffering.

6.29    Mental pain and suffering.

6.30    Mental anguish more than anguish and resentment, that is grief, severe disappointment, indignation, wounded pride, shame despair, public humiliation: severe disruption in daily routine. The mental anguish of his family has been enormous long of the extraordinary physical injuries to the daughter/sister resulting from the Defendants actions.

6.31    Physical impairment and loss of enjoyment of life, loss of Plaintiff's former lifestyle, including loss of ability to play sports, or have a normal social life.

6.32    Loss of impairment of past and future earnings capacity.

## VII. DEMAND FOR A JURYTRIAL

7.1    Plaintiffs hereby demand a trial by jury.

## VIII. REQUESTFOR DISCLOSURE

8.1     Under Texas Rule of Civil Procedure 194.1, Plaintiffs request the Defendants disclose, within 30 days of the service of this request, the information or material described in Rule 194.2(a) through (l).

## IX. AUTHENTICATION AND PRESERVATION

9.1    In accordance with Texas Rule of Civil Procedure 193.7, notice is hereby given that Plaintiffs intend to use at trial and/or in pre-trial proceedings, all documents produced in discovery.

47

Plaintiffs require and demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Uvalde school shooting or other violations made the basis of the Petition and the alleged damages, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case. The Plaintiff specifically assert that they have not been given access to Robb Elementary School despite repeated requests; That the scene of the crimes at Robb Elementary school has already been cleaned; that the cleaning resulted in the spoliation of evidence; That there have been public comments about demolishing Robb Elementary by one or more of the Defendants; That the demolition of Robb Elementary will result in the Plaintiffs inability to prove their case; That the failure to permit access to the Plaintiffs constitute violations of due process of law.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants DANIEL DEFENSE, LLC, DANIEL DEFENSE, INC., OASIS OUTBACK, LLC; FIREQUEST INTERNATIONAL, INC., FLASH CO., INC., be cited to appear and answer herein and upon a final hearing, Plaintiffs have judgement against Defendants, jointly and severally, for damages described, for cost of suit, pre-judgement interest permitted by law, and for such other relieve, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

**WILLIAMS ATTORNEYS, PLLC**

48

Copy from re:SearchTX

By: /s/ *Justin L. Williams*
JUSTIN L. WILLIAMS
SBN: 21555800
SEAN WILLIAMS
SBN: 24103990
RYAN WILLIAMS
SBN: 24103989
DALILA RAMOS
SBN: 24128863
500 N. Water Street, Suite500
Corpus Christi, TX 78401
Telephone: (361) 885-0184
Facsimile: (361) 885.0309
Service Email:service@williamstrial.com

*AND*

**MARK A. DI CARLO, PLLC**

By: /s/ *Mark Di Carlo*
Mark A. Di Carlo
SBN: 05812510
722 Elizabeth St.
Corpus Christi, Texas78404
Telephone (361) 888-6968

49

Copy from re:SearchTX